UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

CHRISTOPHER JAMES SCHOLTES,

          Plaintiff,               Case No. 1:21-cv-237

v.                            Honorable Robert J. Jonker

MICHIGAN DEPARTMENT OF JUSTICE et
al.,

          Defendants.
_____/

## OPINION

       This is a *pro se* civil rights action brought under 42 U.S.C. § 1983 by a pretrial

detainee who is confined at the Van Buren County Jail.  Under the Prison Litigation Reform Act,

Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner

action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon

which relief can be granted, or seeks monetary relief from a defendant immune from such relief.

28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c).   The Court must read Plaintiff's *pro se*

complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's

allegations as true, unless they are clearly irrational or wholly incredible.  *Denton v. Hernandez*,

504 U.S. 25, 33 (1992).  Applying these standards, the Court will dismiss Plaintiff's complaint for

failure to state a claim.

## Discussion

### I.  Factual allegations

       As noted above, Plaintiff is presently incarcerated at the Van Buren County Jail in

Paw Paw, Michigan.  As Defendants, Plaintiff names the Michigan Department of Justice, Sheriff

Daniel Abbott, Lieutenant Manuel Delarosa, Deputy Mark Curtis, Deputy Darin Mentink, Doctor Nisha Chellam, Nurse Roselynn Hickmott, and Sergeant Mike Shannon.  Plaintiff initially filed this action in the United States District Court for the Eastern District of Michigan.   However, on March 11, 2021, that court dismissed Defendant Michigan Department of Justice and transferred the case to this Court.

Plaintiff alleges that he has a heart murmur, cardiovascular disease, asthma, chronic bronchitis, anxiety, and severe arthritis.  Plaintiff states that shortly after arriving at the jail, he tested positive for COVID-19.  Plaintiff contends that while suffering from COVID-19, he was denied a proper diet and adequate medical care.  Plaintiff asserts that Defendants Chellam and Hickmott ignored his requests for medical assistance when he was suffering from COVID-19.

Plaintiff alleges that jail officials failed to follow CDC guidelines, including the use of masks, gloves, disinfectants, and sufficient soap.  Nor did Defendants maintain social distancing or refrain from practices which caused cross-contamination of cells.  Plaintiff states that Defendants placed him in a six-man cell with prisoners who had already been convicted.  Plaintiff claims that his cellmates bullied and threatened him because of his COVID-19 positive status, but that when he asked to be placed in segregation for his own safety, his request was denied.  Plaintiff states that the only way he can safely have his medical needs met is if he is released from jail.

The Court notes that Plaintiff also filed a habeas corpus action asserting these same allegations and seeking release from jail.  *See Scholtes v. Abbott*, No. 1:21-cv-165 (W.D. Mich. Mar. 1, 2021).  That action was dismissed without prejudice for failure to exhaust state court remedies.  *Id.* at ECF Nos. 6-8.  In the opinion dismissing that action, the Court stated:

> Publicly available records reveal that Petitioner is awaiting trial in two criminal prosecutions:  Van Buren County Circuit Court Case No. 2020-0022627-FH, where he is charged with breaking and entering a building, larceny in a building, and two counts of unlawful driving away of a motor vehicle; and Van Buren County Circuit

Court Case No. 2020-0022628-FH, where he is charged with assault with intent to murder and first-degree home invasion.  *See* https://micourt.courts.michigan.gov/ CaseSearch/Court/C36/Search?searchText=christopher%20%20%20scholtes (visited Feb. 23, 2021).

Petitioner indicates that he suffers from underlying health issues, including a heart murmur and cardiovascular disease.  He complains that the personnel at the Van Buren County Jail do not take the threat from the COVID-19 virus[] seriously. Petitioner reports that he contracted COVID-19 months ago and that he is still suffering complications, including high blood pressure, chest pain, fatigue, shortness of breath, and excessive weight gain.  (Pet., ECF No. 1, PageID.6.) Petitioner argues that Respondent's failure to protect Petitioner from the COVID-19 virus and failure to properly treat him for the symptoms and consequences of the illness violate his Fifth, Eighth, and Fourteenth Amendment rights.  Petitioner seeks immediate release from detention, to his fiancé and family in Texas, on supervised release subject to GPS tether and house arrest.

*Id.* at ECF No. 6, PageID.6-7 (footnote omitted).

In support of his complaint, Plaintiff has filed an affidavit (ECF No. 5) which details the events complained of in his complaint.  Plaintiff attests that on July 14, 2020, he was extradited from Texas to the Van Buren County Jail.  Upon arriving at the jail, his temperature was taken and he filled out a COVID-19 questionaire.  Plaintiff was placed in holding with five other prisoners without masks, in cell sanitation, or soap.  The next day, Plaintiff developed severe body pain and a severe headache.  Plaintiff's cellmates called for help and a Corrections Officers came and removed Plaintiff from the cell.  Plaintiff's temperature was checked and was normal, but his blood pressure was 136/102 and his heart rate was 112.  Plaintiff stated that he felt like he was being ripped apart on the inside.  Corrections Officer Laws consulted medical, who said to give Plaintiff two Tylenol and that a nurse would see him in the morning.  Plaintiff was placed in a unit alone, but later that night another detainee was placed in the same cell with him.  No masks or other precautions were used.

The next day, July 16, 2020, Plaintiff's temporary cellmate was moved to the general jail population.  Plaintiff waited all day to see a nurse, to no avail.  Finally, Plaintiff asked

to see a nurse so that he could get some Tylenol for his headache and body aches.  Nurse Becky checked Plaintiff's blood pressure, which was normal, and noted that Plaintiff's heart rate was elevated to 100 beats a minute.  She gave Plaintiff two Tylenol and told him that he was probably stressed and having sensitivity to the bright lights.  Sometime between 6:45 and 9:00 pm, Corrections Officer Small moved Plaintiff to a cell with four other detainees.  Plaintiff states that no one had masks, that the cell was filthy, and that there were no cleaning supplies.  Plaintiff was the only one who was not on the floor, and instead was lying on a "slab."  On July 17, 2020, one of the prisoners was released from the jail.  Plaintiff continued to feel unwell.

On July 18, 2020, Nurse Becky and Corrections Officer Spears came to Plaintiff's cell and told him that his cellmate in Texas had tested positive for COVID-19.  Plaintiff began to cry and agreed to take a COVID-19 test, but stated that he was sure he had COVID-19 because he had been feeling sick for the past three days and had begun to experience chest pain and difficulty taking deep breaths.  Nurse Becky said that she wished that Plaintiff would have told her earlier, and Plaintiff replied that he had told several jail employees that he was sick, but no one took him seriously.  Plaintiff was given a COVID-19 test and other inmates were offered the test.  However, no one was given a mask or any other PPE.  Plaintiff was given given extra suicide blankets because he was chilled.

On July 19, 2020, Defendant Mentink came to Plaintiff's cell dressed in a paper gown, mask, and gloves, and told Plaintiff that he was going to the hospital to take an instant COVID-19 test.  Plaintiff was given a mask and taken to the emergency room in Paw Paw.  The ER doctor asked Plaintiff how he was feeling and he reported his medical history and symptoms. Plaintiff's test result showed that he had COVID-19.  Plaintiff was told that he needed to be quarantined and under observation.  Plaintiff told the nurse that he was afraid of dying far away

4

from his family, and that the jail was not equipped to care for him and was not even serving hot meals.

The ER nurse gave Defendant Mentink Plaintiff's aftercare instructions and stated that Plaintiff needed to be checked on every half hour to make sure that he was not having difficulty breathing.  Plaintiff was returned to the jail and was placed in cell H3.  Plaintiff informed the detainees in the next cell that he was COVID-19 positive and was scared, weak, and hungry. Plaintiff realized that he had not been given dinner and pushed the panic button.  Other prisoners began yelling on Plaintiff's behalf.  Approximately twenty minutes later, Corrections Officer Tessar responded and stated that he would see about getting Plaintiff some food.  After another thirty minutes, Corrections Officer Tessar brought food bags for Plaintiff, as well as additional food bags for the other detainees.

On July 20, 2020, Plaintiff and the other detainees were given brown bag meals for breakfast, lunch, and dinner, but no one checked on Plaintiff's medical condition or answered his request to see health care or to use a phone.  There was still no type of quarantine or use of masks. Plaintiff was finally allowed to use the phone to call his wife in Texas at 11:30 pm and he begged her to get help.  Plaintiff's wife stated that she would make some phone calls in an attempt to get Plaintiff some help.

On July 21, 2020, Plaintiff was given a breakfast of two cold hardboiled eggs, two small tortilla shells, a choice of milk or apple juice, and a piece of cheese.  Plaintiff asked to see a nurse and for a pain reliever and was told that medical would be informed.  Plaintiff claims that most jail personnel avoided his cell while making rounds, but concedes that Sergeant Denoo checked his cell during her rounds.  Plaintiff received a cold bag lunch of four slices of bread, two scoops of peanut butter, two packs of jelly, some mini pretzels, and one cookie.  Plaintiff again

asked to see the nurse and for some Tylenol, and was told that the nurse would be informed. Plaintiff states that no nurse ever came.

On July 22, 2020, Plaintiff was experiencing severe pain, hypertension, shortness of breath, and depression.  Defendant Mentink escorted Plaintiff to the video court room for a hearing, but Plaintiff had to hold onto the wall to keep from falling.  By the time he reached his seat, he was out of breath and exhausted.  There was a delay in the hearing because they had to wait for Judge McKay, so Plaintiff stayed hunched over in his chair while Defendant Mentink stood behind the desk dressed in PPE.  After a few minutes, Defendant Mentink panicked and repeatedly asked Plaintiff's lawyer to ask the judge to hurry up, stating that he was trapped in a room with a prisoner who had COVID-19.  Plaintiff's lawyer complied and eventually the judge and prosecutor appeared.  At the conclusion of the hearing it was agreed that Plaintiff's case would be postponed for 30 days pending his COVID-19 status.  By the time that Plaintiff was returned to his cell, he was feverish, sweating, and could barely stand.  Plaintiff began crying and told Corrections Officer Ferguson that he was being denied hot meals, cleaning supplies for his cell, and proper medical supervision and care for his COVID-19 symptoms.  Plaintiff asked why he was being treated that way and Ferguson said, "I know.  I'm sorry . . . ," and walked away.  (ECF No. 5, PageID.91–92.)

Plaintiff suffered from pain and mental anguish for the next 36 hours.  On July 24, 2020, Defendant Hickmott came to Plaintiff's cell in full PPE and checked his vitals and asked how he was feeling.  Plaintiff told her that he felt like he was dying.  Plaintiff complained about his treatment and the lack of hot meals and fresh produce.  Plaintiff slept most of that day.  At some point, four new prisoners were moved next door to Plaintiff with no masks or cell cleaning.

On July 25, 2020, Plaintiff received three hot meals and was given Tylenol twice, but was still not checked on each hour as the ER doctor had advised.  Jail personnel still failed to provide masks for inmates or detainees, but only for staff and trustees, who got gloves and masks. On July 28, 2020, Corrections Officers Murphy and Rhodes were overheard discussing the lack of procedures to deal with COVID-19, and the fact that Plaintiff was the first and that they had been unprepared to deal with him.

On August 1, 2020, Plaintiff was medically cleared to go into the general population.  On August 2, 2020, Plaintiff was offered a shower, clean clothes, and a fresh blanket. On August 4, 2020, Plaintiff was placed in a six-man cell as the seventh man.  The prisoners were not given masks, cleaning materials, or allowed to social distance.  On August 5, 2020, Plaintiff discovered that all of the other prisoners were federal and state post-conviction prisoners.  The other inmates did not want Plaintiff in the cell because he had had COVID-19.  On August 6, 2020, Plaintiff kited medical complaining of anxiety, sleep deprivation, and depression.

On August 12, 2020, Plaintiff kited medical complaining of chest pain and a resurgence of COVID-19 symptoms.  Nurse Becky called Plaintiff out on August 13, 2020, to discuss his symptoms.  Nurse Becky told Plaintiff that she could retest him for COVID-19, but if he tested positive he would have to go back into quarantine and lose his privileges.  Plaintiff almost cried, stating that he could not go through that again.  Nurse Becky stated that she would rather treat Plaintiff's symptoms, and that there were long-term effects from COVID-19, which Plaintiff could suffer for a long period of time.

On August 16, 2020, Plaintiff began feeling ill, which was noticed by one of his cellmates.  The other prisoner, Sikkema, was serving time for stabbing a fellow prisoner and told Plaintiff that if he got sick he was going to "crush" him.  On August 18, 2020, Plaintiff told

Defendant Curtis that he needed to be moved out of general population because his cellmates were threatened by his COVID-19 status and were hostile to him.  Defendant Curtis said he did not think it was necessary to move Plaintiff.

In September, Plaintiff was placed back on an anti-depressant.  On October 3, 2020, Plaintiff sent a complaint to the Michigan Department of Justice regarding his treatment in the jail. On October 21, 2020, Plaintiff wrote and filed a grievance on several corrections officers who are not named as Defendants in this case.  The grievance noted that corrections officers failed to wear masks or PPE when handing out laundry and was signed by all the prisoners in Cell 5.  Plaintiff did not receive a response, but some of the corrections officers subsequently began to wear PPE. On October 23, 2020, Plaintiff asked Defendant Abbott why Corrections Officer Kelly was not wearing a mask when she passed out trays.  Defendant Abbott did not know and said he would try to talk to her.  However, Defendant Abbott later stated that he could not control what other officials did.

Plaintiff filed additional grievances regarding the behavior of prison officials and the lack of masks for prisoners on October 25, 26, and 28 of 2020.  On October 28, 2020, Corrections Officer Laws told inmate Struble that he would return a chess piece that had rolled into the hall if inmate Struble would not grieve him for failing to wear a mask.  On October 29, 2020, Plaintiff was seen by Defendant Chellam, who told Plaintiff that he probably only had the flu and that COVID-19 was not real.  Plaintiff explained the symptoms he had experienced and Defendant Chellam sought confirmation from Nurse Becky.  Nurse Becky confirmed that Plaintiff had been very ill and that he had been diagnosed at the hospital.  Plaintiff became angry with Defendant Chellam for the lack of care he had experienced while sick and he returned to his cell.

8

Nurse Becky later told Plaintiff that his anti-depressant medication dosage had been increased as he requested and that he has been prescribed medication for his elevated blood pressure.

On November 6, 2020, Plaintiff asked Corrections Officer Laws why she did not wear a mask or gloves.  She informed the prisoners in Cell 5 that she was tested every two weeks and felt that was sufficient.  On November 7, 2020, Nurse Becky checked Plaintiff's vitals because he was not feeling well.  Plaintiff's blood pressure was elevated at 154/92, and his heart rate was 104.  When Plaintiff asked Nurse Becky why she wore PPE when other jail officials did not, she said that it was her job to keep the inmates safe.

On November 23, 2020, prisoner Alex Murphy was placed into Cell 5 with Plaintiff and six other prisoners.  The cell was meant to house a maximum of six prisoners, so with seven there was no way to social distance.  This arrangement was maintained until December 4, 2020.  On December 8, 2020, Corrections Officer Kelly handed out makeshift masks to prisoners that did not comply with CDC guidelines.

On December 12, 2020, Plaintiff wrote a letter to Defendant Delarosa requesting names for a civil complaint and seeking updates on his grievances.  On December 15, 2020, Defendant Shannon told Plaintiff that Defendant Delarosa was not going to cooperate with him and that he should go through his lawyer.  Plaintiff stated that he did not have a lawyer and Defendant Shannon told him to go through available legal channels.  Defendant Shannon told Plaintiff that he would tell his staff about the importance of using PPE, and that the masks given to prisoners were all they had.  When Plaintiff asked about sanitary wipes, spray bottles, and soap dispensers in cells, Defendant Shannon stated that it was not going to happen.

On December 16, 2020, Plaintiff experienced chest pain, high blood pressure, and elevated heart rate.  However, he tested negative for COVID-19.  On December 17, 2020, Nurse

Becky told Plaintiff that his blood pressure medication was increased and that he had been placed on a migraine pill.  Following the receipt of his new medication, Plaintiff felt ill.  However, no one rechecked Plaintiff's blood pressure in response to his request.  On December 18, 2020, Plaintiff stopped taking his Elavil and migraine pill, and told the nurse that he was having chest pain.

One of Plaintiff's cellmates tested positive for COVID-19 after complaining of chest pain on December 21, 2020.  That prisoner was moved to the COVID-19 positive dorm. Corrections Officer Boyer confirmed that the jail was on lockdown due to a major COVID-19 outbreak, but Plaintiff and two other cellmates tested negative.  Plaintiff's remaining two cellmates refused the test.  Prisoners were finally given actual medical masks.  On December 22, 2020, Plaintiff reported feeling ill to Defendant Hickmott, and his heart rate was elevated.  Plaintiff filed a grievance regarding the lack of clean bedding, clothes, and towels following COVID-19 prisoners being in the cell.

On December 23, 2020, prisoners asked Defendant Hickmott why the "finger device" and contact thermometer were not being sanitized between prisoners.  Defendant Hickmott responded that it didn't matter because everyone was on quarantine.   Plaintiff's heart rate continued to be high.  However, on December 24, 2020, Plaintiff's heart rate was 77 and 60 respectively.

No one checked Plaintiff's vital signs from December 25 or 26 of 2020. Corrections Officer Kelly failed to wear gloves while passing out meal trays from December 25, 2020, onward.  When asked about it, Officer Kelly stated that it did not matter because she had already had COVID-19.  On December 27, 2020, Plaintiff's blood pressure was 163/96 and his heart rate was 83.  On December 28, 2020, one of Plaintiff's cellmates told him that his lawyer

said the jail was telling the public that it was COVID-19 free.  On December 29, 2020, Plaintiff's heart rate was 98 and 88.

On December 30, 2020, Nurse Becky asked Plaintiff if he would be willing to have blood work done.  Plaintiff agreed.  On the next day, Plaintiff requested blood work via a medical kite.  Plaintiff listed his symptoms as chest pain, shortness of breath, tension in the shoulders and neck, and swelling of the hands, ankles, and feet.  Plaintiff states that he heard from one of his cellmates that prisoners in the jail continued to be moved from cell to cell in a manner that exposed COVID-19 negative prisoners to the virus.

On January 1, 2021, Plaintiff was on the phone with his wife when he suddenly got a headache and his neck and ears grew hot.  Plaintiff looked at his hands, which turned very red. Plaintiff told his wife, who advised him to call a nurse.  Plaintiff stated that there was no nurse on duty and that his complaints did not result in anyone helping him.  Plaintiff got off the phone and went to lie down.  Plaintiff also kited medical.  On January 3, 2021, one of the other prisoners complained of symptoms of COVID-19 and asked for Tylenol.  Sergeant Dereo told him to submit a health care kite.

On January 5, 2021, Plaintiff's blood pressure was 140/91 and the nurse told Plaintiff that his color looked better.  Defendant Hickmott asked Plaintiff about his sleeping habits, but never asked about his continuing symptoms.  On January 6, 2021, Plaintiff was given an antibiotic and pain reliever for an infected tooth.  On January 7, 2021, Nurse Becky told Plaintiff that he had a two week clinic visit coming up for blood work and asked Plaintiff if he wanted to do the blood work early.  Plaintiff said he would, if possible.  On the same date, Plaintiff discovered that he had been charged for the services of the doctor and nurses, and for medications related to COVID-19 ever since June of 2020.

Plaintiff states that, as a result of Defendants' conduct toward him, he suffers from physical, mental, and emotional pain.  Plaintiff's symptoms include anxiety, hypertension, water retention, chest pain, poor circulation, shortness of breath, and irregular heart rhythm.  Plaintiff claims that Defendants violated his rights under the Eighth and Fourteenth Amendments, as well as under state law.  As in his habeas corpus action, Plaintiff seeks supervised release from jail to his family in Texas, as well as declaratory relief.  Alternatively, Plaintiff seeks compensatory and punitive damages.

## II.  Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the

*Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### III. Request for release from jail

Plaintiff states that the refusal to release him from jail violates his Fourteenth Amendment due process rights, and he seeks supervised release from jail to his family in Texas. Such relief is available only upon habeas corpus review. "The Supreme Court has held that release from confinement—the remedy petitioner[] seek[s] here—is 'the heart of habeas corpus.'" *Wilson*, 961 F.3d at 838 (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 498 (1973)).[1] A challenge to the fact or duration of confinement should be brought as a petition for habeas corpus and is not the proper subject of a civil rights action brought pursuant to § 1983. *See Preiser*, 411 U.S. at 484 (the essence of habeas corpus is an attack by a person in custody upon the legality of that custody and the traditional function of the writ is to secure release from illegal custody). As a consequence, Plaintiff is not entitled to release in this civil rights action.[2]

---

[1] The *Wilson* petitioners were federal prison inmates who brought habeas claims under 28 U.S.C. § 2241 similar to those claims brought by Petitioner in his first COVID-related habeas petition.

[2] The Court notes that Plaintiff has already presented this argument to the Court in his prior habeas corpus action. (1:21-cv-165, ECF No. 6.) As stated in the opinion dismissing that action, Plaintiff's request for habeas corpus relief is not available until after he has pursued his state court remedies. (*Id.* at PageID.9.)

Therefore, Plaintiff's  request for relief in the form of supervised release is properly dismissed without prejudice to Plaintiff's ability to bring a future habeas corpus action once he has exhausted his state court remedies.

## IV. Deliberate indifference

Plaintiff alleges that the Defendants were deliberately indifferent to his health and safety.  As noted above, Plaintiff states that he has a series of underlying medical conditions and contracted COVID-19 while incarcerated at the Van Buren County Jail because Defendants failed to take adequate steps to protect prisoners from becoming infected.   Plaintiff alleges that Defendants at the jail failed to follow CDC guidelines, including the use of PPE and social distancing, and that they engaged in practices which caused cross-contamination of cells.  Plaintiff contends he was denied a proper diet, and that Defendants Chellam and Hickmott ignored his requests for medical assistance when he was suffering from COVID-19.   Plaintiff alleges that Defendant Mentink was told by the ER nurse that he needed to checked every half hour, and that Plaintiff was not checked according to the hospital's instructions. Plaintiff also claims that following his quarantine for COVID-19, Defendants placed him in a six-man cell with prisoners who bullied and threatened him, but that when he asked to be placed in segregation for his own safety, his request was denied by Defendant Curtis.

As noted above, Plaintiff is a pretrial detainee.  Although the Eighth Amendment's protections specifically apply only to convicted prisoners, *see Barber v. City of Salem, Ohio*, 953 F.2d 232, 235 (6th Cir. 1992), the courts have held that the Due Process Clause of the Fourteenth Amendment operates to guarantee those same protections to pretrial detainees.  *Thompson v. Cnty. of Medina*, 29 F.3d 238, 242 (6th Cir. 1994); *see also Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988) (stating that alleged violation of pretrial detainee's Eighth and Fourteenth Amendment rights is governed by the "deliberate indifference" standard).  However, in *Kingsley*

14

*v. Hendrickson*, 576 U.S. 389 (2015), the Supreme Court held that evaluation of the use of excessive force on pretrial detainees is conducted under the Due Process Clause of the Fourteenth Amendment, which does not include the subjective prong of the Eighth Amendment deliberate-indifference standard.  Instead, the relevant inquiry is whether the force purposely or knowingly used against the prisoner was objectively unreasonable.  *Id.* at 398; *see also Coley v. Lucas Cnty.*, 799 F.3d 530, 538 (6th Cir. 2015) (citing *Kingsley*).

Since *Kingsley*, however, neither the Sixth Circuit nor the Supreme Court has clearly indicated whether the deliberate-indifference standard of the Eighth Amendment (requiring both objective and subjective components), which traditionally has been applied to prison detainees' conditions-of-confinement claims (such as denials of medical care or cell conditions), is affected by the holding in *Kingsley*.  In *Richmond v. Huq*, 885 F.3d 928 (6th Cir. 2018), the Sixth Circuit declined to decide whether, in the context of a failure to provide medical care, *Kingsley* eliminated the requirement of proving the subjective prong of the deliberate indifference test for pretrial detainees under the Fourteenth Amendment.  *Id.* at 938 n.3; *see also Griffith v. Franklin Cnty.*, 975 F.3d 554 (6th Cir. 2020) (declining to reach the issue, finding that allegations did not meet the recklessness standard applied by some courts after *Kingsley* to medical claims for pretrial detainees) (note contrasting view by Clay, J., dissenting); *Martin v. Warren Cnty.*, 759 F. App'x 329, 337 n.4 (6th Cir. 2020) (declining to address the question) (citing *Richmond*, 885 F.3d at 937 n.3 (6th Cir. 2018) (observing that *Kingsley* calls into serious doubt whether a pretrial detainee must demonstrate the subjective element of the deliberate-indifference standard, but not reaching the issue)).

Nevertheless, the Sixth Circuit has, in a variety of decisions, continued to apply the deliberate-indifference standard to condition-of-confinement claims by pretrial detainees, without

considering *Kingsley*.  *See Hicks v. Scott*, 958 F.3d 421, 438 (6th Cir. 2020); *Richko v. Wayne Cnty.*, 819 F.3d 907, 915 (6th Cir. 2016); *McCain v. St. Clair Cnty.*, 750 F. App'x 399, 403 (6th Cir. 2018); *Medley v. Shelby Cnty.*, 742 F. App'x 958, 961 (6th Cir. 2018); *Ruiz-Bueno III v. Scott*, 639 F. App'x 354, 358 (6th Cir. 2016); *see also Cameron v. Bouchard*, 815 F. App'x 978, 984–85 (6th Cir. 2020) (declining to decide whether *Kingsley* controlled jail detainees' challenge to COVID-19 precautions and holding that, at a minimum, a violation of due process required more than simple negligence).  As a consequence, the two-pronged deliberate-indifference standard continues to apply to condition-of-confinement claims by pretrial detainees.

The Eighth Amendment prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain."  *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981).  The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998).  The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement."  *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment."  *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety."  *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate

indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims).

In a case brought by federal prisoners under 28 U.S.C. § 2241, the Sixth Circuit addressed the issue of whether the Bureau of Prisons (BOP) violated the Eighth Amendment rights of medically vulnerable inmates at the Elkton Federal Correctional Institution by failing to adequately protect them from COVID-19 infection. *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020). In the opinion, the Sixth Circuit found that the plaintiffs in *Wilson* had easily satisfied the objective component of an Eighth Amendment claim:

> In assessing the objective prong, we ask whether petitioners have provided evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death. The BOP acknowledges that "[t]he health risks posed by COIVD-19 are significant." CA6 R. 35, Appellant Br., PageID 42. The infection and fatality rates at Elkton have borne out the serious risk of COVID-19, despite the BOP's efforts. The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other—and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death. Petitioners have put forth sufficient evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

*Id.* at 840.

The Sixth Circuit went on to address the subjective prong of an Eighth Amendment claim, noting that the pertinent question was whether the BOP's actions demonstrated deliberate indifference to the serious risk of harm posed by COVID-19 in the prison.

> There is no question that the BOP was aware of and understood the potential risk of serious harm to inmates at Elkton through exposure to the COVID-19 virus. As of April 22, fifty-nine inmates and forty-six staff members tested positive for COVID-19, and six inmates had died. "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). The BOP acknowledged the risk from COVID-19 and implemented a six-phase plan to mitigate the risk of COVID-19 spreading at Elkton.

17

The key inquiry is whether the BOP "responded reasonably to th[is] risk."  *Farmer*, 511 U.S. at 844.  The BOP contends that it has acted "assiduously to protect inmates from the risks of COVID-19, to the extent possible."  CA6 R. 35, Appellant Br., PageID 42.  These actions include

> implement[ing] measures to screen inmates  for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings; conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff.

*Id.* at 42–43.

The BOP argues that these actions show it has responded reasonably to the risk posed by COVID-19 and that the conditions at Elkton cannot be found to violate the Eighth Amendment.  We agree.

Here, while the harm imposed by COVID-19 on inmates at Elkton "ultimately [is] not averted," the BOP has "responded reasonably to the risk" and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights.  *Farmer*, 511 U.S. at 844.  The BOP implemented a six-phase action plan to reduce the risk of COVID-19 spread at Elkton.  Before the district court granted the preliminary injunction at issue, the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks.  The BOP initially struggled to scale up its testing capacity just before the district court issued the preliminary injunction, but even there the BOP represented that it was on the cusp of expanding testing.  The BOP's efforts to expand testing demonstrate the opposite of a disregard of a serious health risk.

*Id.* at 840–41.

In its decision, the Sixth Circuit recognized that other Sixth Circuit decisions have found similar responses by prison officials and medical personnel, such as cleaning cells, quarantining infected inmates, and distributing information about a disease in an effort to prevent spread, to be reasonable.  *Id.* at 841 (citing *Wooler v. Hickman Cnty.*, 377 F. App'x 502, 506 (6th Cir. 2010); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014); *Harrison v.*

*Ash*, 539 F.3d 510, 519–20 (6th Cir. 2008); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018).

The *Wilson* Court also noted that other circuits had concluded that similar actions by prison

officials demonstrated a reasonable response to the risk posed by COVID-19:

> In *Swain* [*v. Junior*], the Eleventh Circuit granted a stay of a preliminary injunction
> pending appeal on state inmates' Eighth Amendment claims.  958 F.3d [1081,] [ ]
> 1085 [(11th Cir. 2020) (per curiam)].  The Eleventh Circuit held that "the inability
> to take a positive action likely does not constitute 'a state of mind more
> blameworthy than negligence,'" and "the evidence supports that [Metro West
> Detention Center ("MWDC") is] taking the risk of COVID-19 seriously."  *Id.* at
> 1088–90 (citation omitted).  In response to the pandemic in early March, MWDC
> began "cancelling inmate visitation; screening arrestees, inmates, and staff; and
> advising staff of use of protective equipment and sanitation practices" and, after
> reviewing further CDC guidance, began "daily temperature screenings of all
> persons entering Metro West, establish[ed] a 'COVID-19 Incident Command
> Center and Response Line' to track testing and identify close contacts with the
> virus, develop[ed] a social hygiene campaign, and mandate[d] that staff and inmates
> wear protective masks at all times." *Id.* at 1085–86.  The Eleventh Circuit held that,
> because MWDC "adopted extensive safety measures such as increasing screening,
> providing protective equipment, adopting [physical] distancing when possible,
> quarantining symptomatic inmates, and enhancing cleaning procedures," MWDC's
> actions likely did not amount to deliberate indifference.  *Id.* at 1090.

> Similarly, the Fifth Circuit granted stays of two preliminary injunctions in
> *Valentine* [*v. Collier*, 956 F.3d 797 (5th Cir. 2020) (per curiam)] and *Marlowe* [*v.
> LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam)].
> In *Valentine*, inmates at Texas's Wallace Pack Unit filed a class action suit against
> the Texas Department of Criminal Justice ("TDCJ") alleging violations of the
> Eighth Amendment.  956 F.3d at 799.  In response to the COVID-19 pandemic,
> TDCJ had taken preventative measures such as providing "access to soap, tissues,
> gloves, [and] masks," implementing "regular cleaning," "quarantin[ing] of new
> prisoners," and ensuring "[physical] distancing during transport."  *Id.* at 802.  The
> Fifth Circuit determined that the district court applied the wrong legal standard by
> "collaps[ing] the objective and subjective components of the Eighth Amendment
> inquiry" by "treating inadequate measures as dispositive of the Defendants' mental
> state" under the subjective prong and held that "accounting for the protective
> measures TDCJ has taken" the plaintiffs had not shown deliberate indifference. *Id.*
> at 802–03.  In *Marlow*e, the Fifth Circuit relied on its reasoning in *Valentine* and
> again reiterated that there was "little basis for concluding that [the correctional
> center's] mitigation efforts," which included "providing prisoners with disinfectant
> spray and two cloth masks[,] . . . limiting the number of prisoners in the infirmary
> lobby[,] and painting markers on walkways to promote [physical] distancing," were
> insufficient.  2020 WL 2043425, at *2–3.

*Wilson*, 961 F.3d at 841–42.

After reviewing the cases, the *Wilson* Court held that even if the BOP's response to COVID-19 was inadequate, it took many affirmative actions not only to treat and quarantine inmates who had tested positive, but also to prevent widespread transmission of COVID-19.  The Court held that because the BOP had neither disregarded a known risk nor failed to take steps to address the risk, it did not act with deliberate indifference in violation of the Eighth Amendment. *Id.* at 843–44.

In addition, in *Cameron v. Bouchard,* 818 F. App'x 393 (6th Cir. 2020), the Court relied on *Wilson* to find that pretrial detainees in the Oakland County Jail were unlikely to succeed on the merits of their Eighth and Fourteenth Amendment claims.  The plaintiffs in *Cameron* claimed that jail officials were deliberately indifferent to the substantial risk of harm posed by COVID-19 at the jail.  The district court initially granted a preliminary injunction requiring the defendants to "(1) provide all [j]ail inmates with access to certain protective measures and medical care intended to limit exposure, limit transmission, and/or treat COVID-19, and (2) provide the district court and Plaintiffs' counsel with a list of medically vulnerable inmates within three business days."  *Id.* at 394.  However, following the decision in *Wilson*, the Court granted the defendants' renewed emergency motion to stay the preliminary injunction, finding that the preventative measures taken by the defendants were similar to those taken by officials in *Wilson* and, thus, were a reasonable response to the threat posed by COVID-19 to the plaintiffs.  *Id.* at 395.  Subsequently, in an unpublished opinion issued on July 9, 2020, the Sixth Circuit vacated the injunction.  *Cameron v. Bouchard*, 815 F. App'x 978 (6th Cir. 2020).

Based on the facts alleged in Plaintiff's affidavit, it appears that officials at the Van Buren County Jail were not entirely prepared to deal with the risk posed by COVID-19.  However, with regard to Plaintiff in particular, it does not appear that the conduct of the named Defendants

rose to the level of an Eighth Amendment violation.  As noted above, Plaintiff was COVID-19 positive when he arrived at the Van Buren County Jail on July 14, 2020.  Plaintiff developed symptoms on July 15, 2020, and was given Tylenol.  Plaintiff complains that his cell was filthy and that no one was wearing masks.  Plaintiff was housed with four other detainees until July 17, 2020, when one of the prisoners was released from jail.  On July 18, 2020, Plaintiff was told that his cellmate in Texas was COVID-19 positive and Plaintiff reiterated that he had been feeling ill for three days.  Plaintiff was tested for COVID-19 in the jail, and again at the hospital on July 19, 2020, where he was told that he had COVID-19.

The ER nurse informed Defendant Mentink that Plaintiff would need to be checked every half hour at the jail to make sure that he was not having difficulty breathing.  Plaintiff claims that his vital signs were checked only intermittently while he was sick.  Plaintiff also states that he did not receive Tylenol as often as he requested, and the fact that he was left alone for long stretches of time each day caused him to suffer from fear and depression.  Plaintiff further complains that until July 25, 2020, all of his meals were cold brown bag meals.  On August 1, 2020, Plaintiff was medically cleared to return to the general population, but complains that he continues to suffer from symptoms of COVID-19 despite being negative for the disease.

While the Court appreciates Plaintiff's frustration with the jail's handling of the COVID-19 pandemic, Plaintiff fails to allege facts showing that the conduct of the named Defendants resulted in any harm to himself.  Plaintiff arrived at the jail already infected with COVID-19.  Although Plaintiff did not receive the close attention he felt was warranted during the duration of his illness, it does not appear that he suffered any harm as a result.  Nor does Plaintiff allege the existence of an effective treatment that he was denied.  Allegations that Plaintiff was only given brown bag cold meals and did not have his vital signs checked every half hour do not

rise to the level of an Eighth Amendment violation.  Especially where such conduct did not worsen his condition or result in any harm to Plaintiff.  The fact is that once Plaintiff contracted COVID-19, there was not much that could be done for him other than to treat his symptoms and wait for the virus to run its course.[3]  Moreover, although Plaintiff alleges that he is suffering from long-term symptoms as a result of his illness, there is no indication that this is the result of any conduct on the part of Defendants.[4]

The Court notes that much of Plaintiff's affidavit details facts which concern the failure of jail personnel to effectively prevent the spread of COVID-19 in the jail after Plaintiff had already recovered from his acute illness.  Although this may implicate the rights of Plaintiff's fellow prisoners, there is no indication that Plaintiff was effected by this conduct.  Plaintiff lacks standing to assert the constitutional rights of other prisoners.  *Newsom v Norris*, 888 F.2d 371, 381 (6th Cir. 1989) (citing *McGowan v. State of Maryland*, 366 U.S. 420, 429 (1961)); *Raines v. Goedde*, No. 92-3120, 1992 WL 188120, at *2 (6th Cir. Aug. 6, 1992).

Plaintiff's claim that Defendant Curtis refused to move him to a different cell after his cellmates "bullied" him for having had COVID-19 is entirely conclusory.  Plaintiff alleges that on August 16, 2020, prisoner Sikkema noticed that Plaintiff was feeling ill and told Plaintiff that if he got sick he was going to "crush" him.  Two days later, Plaintiff told Defendant Curtis about prisoner Sikkema's statement and asked to be moved out of general population.  Defendant Curtis said he did not think it was necessary to move Plaintiff because they were all adults and could

---

[3] According to the Centers for Disease Control and Prevention (CDC), patients who do not require hospitalization should stay away from other people, rest, and stay hydrated (https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fabout%2Fsteps-when-sick.html).

[4] According to the CDC, "long COVID," which includes fatigue, headache, heart palpitations, chest pain, shortness of breath, and depression, can happen to anyone who has had COVID-19, and experts are currently working to learn why some people experience long-term health effects after having COVID-19 (*See* https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects.html).

work things out.  To establish a violation of his Eighth Amendment right to protection, Plaintiff must show that Defendant Curtis was deliberately indifferent to the Plaintiff's risk of injury. *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990); *McGhee v. Foltz*, 852 F.2d 876, 880-81 (6th Cir. 1988).  The alleged threat in this case, to "crush" Plaintiff if Sikkema became sick, does not appear to have been the type of threat indicating that Plaintiff was in serious danger of being assaulted.  Therefore, Defendant Curtis' refusal to move Plaintiff to a different cell did not constitute deliberate indifference.

Finally, the Court notes that Plaintiff's only allegations against Defendant Delarosa are that he refused to provide Plaintiff with names for a civil complaint.  Plaintiff fails to allege any facts which could constitute an Eighth Amendment violation.  Therefore, Defendant Delarosa is properly dismissed from this action.

## V.  Pending motions

Plaintiff has filed a motion seeking to have the Court consider his previously filed motions for appointment of counsel, a preliminary injunction and/or temporary restraining order, and his memo in support of such relief.  (ECF No. 15, referring the Court to ECF No. 4.)  However, because Plaintiff's complaint is properly dismissed for lack of merit, these motions are moot.

## <u>Conclusion</u>

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that to the extent that Plaintiff is seeking habeas corpus relief, such a claim will be dismissed without prejudice to Plaintiff's ability to bring a future habeas corpus action should he exhaust his state court remedies.  The remainder of Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3).  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997).  Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).  Accordingly, the Court does not certify that an appeal would not be taken in good faith.  Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g).  If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

An order and judgment consistent with this opinion will be entered.


Dated:    June 16, 2021              /s/ Robert J. Jonker
                                    ROBERT J. JONKER
                                    CHIEF UNITED STATES DISTRICT JUDGE